*TERRIA HOLCOMB, PERSONAL REPRESENTATIVE FOR THE ESTATE OF DARIUS L. J. HOLCOMB v. SPARTANBURG COUNTY, SPARTANBURG COUNTY SHERIFF'S OFFICE, OFFICER WESLEY E. BENNETT, SHERIFF BILL RHYNE, CITY OF SPARTANBURG, DYLAN DAVIS, AND SEAN JACOB COATS*

**C/A No. 7:24-cv-1145-JDA-KFM**

# Exhibit B

To Defendant Sean Jacob Coats' Motion for Summary Judgment

```
               UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
                 SPARTANBURG DIVISION
TERRIA HOLCOMB, as Personal     |
Representative for the ESTATE  |
OF DARIUS L.J. HOLCOMB,         |
                                |   Civil Action No.:
          Plaintiff,           |7:24-cv-1145-JDA-KFM
                                |
vs.                             |
                                |
SPARTANBURG COUNTY,             |
SPARTANBURG COUNTY SHERIFF'S   |
OFFICE, OFFICER WESLEY E.       |
BENNETT, SHERIFF CHUCK WRIGHT,|
CITY OF SPARTANBURG, DYLAN      |
DAVIS, and SEAN JACOB COATS,   |
                                |
          Defendants.           |
_____|
```

_____

  VIDEOTAPED DEPOSITION OF OFFICER SEAN JACOB COATS

_____


DATE TAKEN:      Tuesday, September 9, 2025

TIME BEGAN:      10:00 a.m.

TIME ENDED:      2:52 p.m.

LOCATION:        Holcombe Bomar, PA
                 101 W. St. John Street, Suite 200
                 Spartanburg, SC 29306


REPORTED BY:     Lisa Garson, CCR
                 Magna Legal Services
                 866-624-6221
                 www.MagnaLS.com



APPEARANCES:

COLIN RAM LAW, LLC
BY:  COLIN V. RAM, ESQUIRE
941 Houston Northcutt Boulevard, Suite 203
Mount Pleasant, South Carolina 29464
843.278.7000
colin@sctrial.com
Representing the Plaintiff

WILLSON JONES CARTER & BAXLEY, PA
BY:  CHARLES F. TURNER, ESQUIRE
325 Rocky Slope Road, Suite 201
Greenville, South Carolina 29607
864.672.3711
cfturner@wjcblaw.com
Representing Defendant Spartanburg County
Sheriff's Office

LOGAN & JOLLY, LLP
BY:  STACEY T. COFFEE, ESQUIRE
1805 North Boulevard
Anderson, South Carolina 29621
864.226.1910
coffee@loganandjolly.com
Representing Defendant City of Spartanburg

CHAPMAN, HARTER & HARTER, PA
BY:  RUSSELL W. HARTER, JR., ESQUIRE
14 Lavinia Avenue
Greenville, South Carolina 29601
864.223.4500
rwhjr@chhlaw.net
Representing Defendant Officer Wesley Bennett

CLAWSON & STAUBES, LLC
BY:  COLE J. GOODE, ESQUIRE
200 East Broad Street, Suite 450
Greenville, South Carolina 29601
864.546.4382
cgoode@cslaw.com
Representing Defendant Dylan Davis


MAGNA
LEGAL SERVICES

(Appearances cont.)

        HOLCOMBE BOMAR, PA
        BY:   TODD RUSSELL FLIPPIN, ESQUIRE
        101 W. St. John Street, Suite 200
        Spartanburg, South Carolina 29306
        864.594.5300
        tflippin@holcombebomar.com
        Representing Defendant Sean Coats

ALSO PRESENT:
        RICHARD EDMUND, VIDEOGRAPHER



Page 4

I N D E X

                                                     PAGE

EXAMINATION

       By Mr. Ram                                       6

       By Mr. Harter                                  152

       By Mr. Turner                                  170

       By Ms. Coffee                                  184

       By Mr. Flippin                                 196

FURTHER EXAMINATION

       By Mr. Harter                                  194

       By Mr. Ram                                     214

Certificate of Reporter                               221

                    E X H I B I T S

COATS EXHIBIT   DESCRIPTION                           PAGE

1    Training History Report                           13

2    Voluntary Statement                               43

3    Defendant Sean Jacob Coats' Responses            109
     to Plaintiff's First Set of Requests for
     Production

4    Defendant Sean Jacob Coats' Answers              111
     to Plaintiff's First Set of Interrogatories

5    Video 22-BWC-Sean Coats                          120

6    Video 13-BWC-Kenneth Sheehan                     130

7    Video First SLED Interview                       134

8    Video Follow-up SLED Interview                   135

9    SLED ATTACHMENT 11 Text Messages                 136

10   SLED ATTACHMENT 15 Text Messages                 138

10   SLED ATTACHMENT 15 Text Messages                 138



MAGNA
LEGAL SERVICES

Page 21

County Sheriff's Office December 9, of 2019.  Are those dates about accurate?

A    Yes, sir.  It looks accurate.

Q    Okay.  And so what prompted you to leave the city police department and join the sheriff's office?

A    I got offered to go to the -- straight to the warrants division, and I thought, at the time, it was a good opportunity to go straight to the warrants division.

Q    Were you serving warrants at the city police department?

A    I've served warrants before, yes, but we didn't have -- there wasn't a warrant specific division.  I was in narcotics when I left the city.

Q    Okay.  And so what -- what was the opportunity that you saw working in the warrants division that prompted you to change law enforcement agencies?

A    I thought maybe, you know, at the time you think you have bigger jurisdiction, more opportunities for training; and then, you know, I guess a basic answer, when you're looking for wanted people it's typically less paperwork than narcotics is, so that could be like a thing, it's



Page 31

investigation of the officer-involved shooting.

How did the sheriff's office not provide the support that you were looking for during that investigation?

A    At the time, in my state of mind, and in, I guess, my frustrations, at the time I was hoping that someone would call and say why are you resigning, don't resign.  I know that's silly, but looking back, like, if someone resigns, like, that's what they're doing, so I guess maybe I had some thought that that would have happened at the time.

Q    But that would have been after you resigned.

A    Like, as I'm resigning, I guess, in my state of mind that maybe someone would be like, well, why are you resigning, and no one said anything to me, really.  At the time that was my thought process.

Q    Okay.  Prior to you submitting your resignation to the sheriff's office, did you feel that the sheriff's office did not provide you with whatever support you were looking for during the officer-involved investigation -- officer-involved shooting investigation?



Page 42

assume that the person had a warrant.

BY MR. RAM:

Q    No.  I understand that, but had you talked to them prior to meeting up with them that day, on February 2, 2023?

A    I don't remember.  I mean, I would have talked to them by text or phone to meet at the skate rink where we met at before we went, so yes.

But we could have talked in the office and went over there; I don't remember.  I'm assuming so.

Q    Did you know what the warrants that were issued against Darius Holcomb, do you know what those were for?

A    Yes.

Q    Before you served them?

A    Yes.

Q    And how did you find out that information?

A    It would have been through either Dylan and/or Bradshaw, and then on Spillman system it also shows you.  Probably, after I was told, I probably would have done that, too.

Q    Okay.  What do you mean, after you were told?



MAGNA
LEGAL SERVICES

Page 43

A     Like, I would have known -- or probably would have -- if I remember correctly, one of them would have mentioned it, and after that I would have noticed it on the Spillman system, and then from them telling me.

Q     Okay.  Do you recall going into the Spillman system and researching the warrants --

A     I would assume I did, but I don't recall.

Q     And would you have done that prior to serving the warrants?

A     Typically, yes.

Q     And what information do you get to see in the Spillman database?

A     Just -- one, to just make sure the warrants in there under the warrants tab. Sometimes, depending on if you're -- if it's -- you can read some of the stuff on it, or the report, or anything like that, or the date, stuff like that. I don't remember exactly with this one, though, since I've been in the house before.

MR. RAM:  Okay.  All right.  I want to show you another document here.  I'll mark this as Exhibit Number 2.

(Coats Exhibit 2, Voluntary Statement, marked for identification.)



Page 55

Q    And they had communicated that to you, correct?

A    By phone, by text, and/or call, and/or in person.

MS. COFFEE:  Object to the form.

BY MR. RAM:

Q    And so when you had that understanding, what did you think to yourself -- well, gosh, here's the situation, two city officers tried to serve a warrant a couple times, they were told to stand down in terms of going inside the home --

MS. COFFEE:  Object to the form.

BY MR. RAM:

Q    What was your reaction to that information you had at that point in time?

MR. TURNER:  Object to the form.

THE WITNESS:  Like the second to third part of that, can you repeat -- or can you just repeat the question?

BY MR. RAM:

Q    Yeah.  What was your reaction, okay, they communicate this information to you:  Hey, we got warrants, we got told we can't go inside, can you help?

MS. COFFEE:  Object to the form.



MAGNA
LEGAL SERVICES

Page 56

MR. FLIPPIN:  Object to form.

THE WITNESS:  Like, again, me specializing in warrants, and them being patrol officers, it was, one, at the time it was assist them in arresting someone who had warrants that has been violent with me in the past and was violent with the mother, so there's all those factors, I thought maybe with my expertise I would be able to get him brought to a judge, arrested without incident, versus them being told to stand down.  At the time I thought I was trying to help.

BY MR. RAM:

Q    What was the nature of the warrant say that you were gonna be serving on Mr. Holcomb?

A    His initial warrant was a sex offender registry violation.

Q    Okay.

A    And then he had a resisting -- a couple resisting arrest warrants from running inside, I believe.

Q    All right.  The warrant, the first warrant for the sex offender registry violation, was that for not paying a fine?

A    I'm not sure.  There's different ways.  I



Page 57

think they have to report their address change and stuff like that.  I know there was -- I've at least arrested him once -- or I've had him arrested once, so twice, technically, for the same thing, so it really should have been a third and sup, but they usually just do first offense for some reason, which is mandatory you're in prison, but I don't exactly remember what caused him to get the warrant.  I don't remember.

Q     Was it a misdemeanor violation or a felony violation?

A     I'm not sure how it's classified.  I believe it's misdemeanor first offense, but I'm not sure.  It was general sessions.

Q     And you had prior dealings with Mr. Holcomb?

A     Yes.

Q     Tell me, what do you recall about your prior dealings with him?

A     My first dealing -- I can't recall the year at this time.  I believe it was 2020, or 2019 -- 2021 at the latest.  I went -- I believe this was the first time I dealt with him -- went to arrest him, his mom let me come inside, he was in his room, very aggressive, cussing us out



Page 58

basically.  We had to use defensive resisting which means he was pulling away getting his hands behind his back once he was told he was under arrest.  As we're walking him out of the house, he turns and spits in his mom's face, like full-blown spit covers her whole face.  We get him out to the car, secure him in the vehicle, and I went back to talk to mom and asked if she wanted to press charges and she refused.  Since it wasn't domestic, I couldn't press charges so I documented that.

And the second time I don't remember if mom was there.  This would have been a year or so later.  And then that was the time where I can't remember how it happened but I ended up getting ahold of his sister or aunt or somebody, and I think they were out getting food, and actually convinced her to bring him into the warrant office and turn himself in -- or she turned him in, so two contrasting differences.

Q    Okay.  And that second time Mr. Holcomb came to the warrant office?

A    Warrant office or the sheriff's office, I don't remember, but I do remember -- if I remember correctly, I convinced the sister to bring him in.

Q    Okay.


MAGNA
LEGAL SERVICES

A     Or the mom to tell the sister.  I can't remember.

Q     So a family member brought him in?

A     Yes.

Q     And was he cooperative with you?

A     I don't think I booked him in.  I don't remember.  I believe he was brought in -- I might have been on another warrant and someone booked him in for me.  I don't remember if I booked him in or not.  I'm leaning towards I didn't because I don't remember.

Q     Well, what was your involvement in that second -- in that second warrant if you didn't book him?

A     I would have just been checking to see what active warrants we had, and I would have saw that he had an active warrant, and then just went and checked it.

Q     Did you have any personal involvement in that second warrant?

A     The charge?  No.  That's handled by our sex offender lady.

Q     Right.  Did you have any personal involvement in the service of that warrant?  Did you talk to -- for example, did you talk to --


MAGNA
LEGAL SERVICES

Page 60

A     Like I said --

Q     -- Darius's family?

A     -- a second ago, I believe that's when I went there, and I believe I talked to mom who said he wasn't there, and then I think that's how I got in touch with the sister the second time.

Q     So you facilitated through communications with the family for him to come in?

A     Yes.

Q     All right.  On February 2, 2023, did you attempt to facilitate that same cooperation for Mr. Holcomb through his family?

A     I would have, if he wouldn't have been home and it wouldn't have been the same situation with the mom; I would have tried to do that.

Q     And why would you have done that if he wasn't at home?

A     Because I couldn't arrest him if he was not at home.

Q     Okay.

A     So if he was not at home, then, yeah, I would have probably tried that.

Q     Okay.  Because it had worked the prior time?

A     Yes.  It's not something I would have


MAGNA
LEGAL SERVICES

Page 61

done initially, right off the get-go, because you don't typically do that.  You do that -- if I do that first, and then he skips town, or whatever, typically, you don't do that unless you get there and he's not there, and then you coordinate that, typically.

Q   Well, when you arrived at Mr. Holcomb's home on February 2, did you knock on the door?

MR. HARTER:  Object to the form.

THE WITNESS:  Yes.  I believe so, yes.

BY MR. RAM:

Q   All right.  And did you speak to his mother in the first few minutes?

A   Yes.

Q   Okay.  Did you -- did you say, hey, mom, we have a warrant for your son, can you help us.

MR. FLIPPIN:  Object to the form.

THE WITNESS:  I don't remember.  I don't remember exactly what I said.  I probably said something along those lines, but when she saw me standing there, I think she also just kind of assumed and that's when she let us in, and then it went from there.  I don't remember my exact verbiage to her.

BY MR. RAM:


MAGNA
LEGAL SERVICES

Page 62

Q    Did you have your body-worn camera turned on when you approached the home?

A    I believe it was somewhere around the time -- without reviewing it, somewhere around the front door, I believe.  I don't recall, though, without looking at it.

Q    Were you aware, prior to going to Mr. Holcomb's home on February 2, 2023, that he had suffered from some sort of mental illness?

A    Since I'm not a doctor and not qualified to say that, I would assume he probably has -- he probably had mental illness.

Q    Well, I'm not asking you to diagnose him.

A    Yeah.

Q    I'm not asking if you're a doctor.

A    I would assume so.

Q    I'm asking if you were aware?

MR. TURNER:  Object to the form.

You can answer.

THE WITNESS:  I would assume so.  I was not directly aware, as in, like, seeing documents, or anything like that.  I would assume by how he's resisted and acted and spit in his mom's face that it could have been something going on, either drugs, and/or


MAGNA
LEGAL SERVICES

Page 63

mental illness.

BY MR. RAM:

Q     What's that?

A     Drugs and/or mental illness, I would assume, just in my opinion.

Q     Before going to his house, did you see any indication through your law enforcement database, or talking to anybody, that he had a mental illness?

A     I don't believe so.

Q     Okay.

A     It would have been an assumption.

Q     Nobody told you that?

A     I don't believe so.

Q     Well, would that have been important information for you to know prior to going to his house on February 2nd?

        MR. TURNER:  Object to the form.

        MR. HARTER:  Object to form.

        MR. FLIPPIN:  Same objection.

        You can answer.

        THE WITNESS:  Again, like I said, I kind of already assumed drugs, and/or mental illness, by my reactions -- by my dealings with him.



Page 70

main one.

Q    Being unpredictable in what respect?

MR. FLIPPIN:  Object to form.

THE WITNESS:  As in my dealings with, I guess, people who I would assume -- not to technical know -- assume what their mental illness, could be super calm; for example, let their sister bring you in one time, and the next time resist -- or the time before resist and spit in your mom's face -- and that's just him, specifically; but a lot of people can be relatively calm until you tell them, hey, you have a warrant, and then it can change; so that, in my experience, can be the biggest difference.

BY MR. RAM:

Q    Did you take any of that into account on February 2, 2023, when you were inside Darius Holcomb's home?

MR. FLIPPIN:  Object to the form of the question.  You can answer.

THE WITNESS:  I think, as I'm going into the house, I believe, more so, I thought about that I knew where his room was, and when he walked towards me brandishing a weapon, when I



Page 71

believe I did have opportunity to be in jeopardy at the time, but I did know where his room was, so I let him go.  I figured that another step this way, he was gonna go in his room, and that's why he went in his room.  I didn't go hands-on right then because his mom insinuated he had a weapon, so I think it was, more so, I knew the layout of the house and it was...

Q    And you said he was brandishing a weapon?

A    He was -- I never saw the weapon at the beginning but --

Q    What weapon was it?

A    I didn't see it.  I didn't see it.  And it was -- he had his arm down by his side, and then the mom stated several times -- I don't know if you've experienced it, but in that situation you get auditory exclusion, if I'm saying that right, and the only thing -- I remember him telling me he was gonna kill me, and I remember the mom saying, I don't know what's in his hand, I don't know what's in his hand; and an officer would assume it's a weapon, and I'm assuming -- I would be assuming that it was the fork weapon he had, but I don't know.  I didn't see it until he was showing it to



Page 72

us.

Q    Well, this is important.  At what point in time did you see a weapon?

A    It probably would have been when he was, like, showing it to us under the door during the stand -- during the barricade.

Q    Okay.  Prior to him going in the bedroom, did you see a weapon in Darius Holcomb's hand?

MR. HARTER:  Object to the form.

THE WITNESS:  No.  It appeared he was holding one behind his right leg, if I remember correctly, and then what his mom's statements; but that's all I remember hearing is the mom kept saying that.

BY MR. RAM:

Q    And what did mom keep saying?

A    Something along -- something along the lines of I don't know what's in his hand, I don't know what's in his hand.  I guess trying to warn us.

Q    Okay.  Did she say, I don't know what's in his hand, or there's a cell phone in his hand?

A    I know specifically she didn't say cell phone with my -- with what I heard.  I remember her saying, I don't know what's in his hand.  I'm


MAGNA
LEGAL SERVICES

Page 73

almost confident that's exactly what she said, but I could be off a word or two.

Q    Did mom say that he has a weapon in his hand?

A    I don't remember her saying weapon.  I remember her saying, I don't know what's in his hand, which I was assuming that would be a weapon by her attempting to warn us with, it seemed like.

Q    Did you think it was a knife or a gun, or do you have any idea what type of weapon?

MR. FLIPPIN:  Object to the form.

THE WITNESS:  I would assume it was some type of blade.  A knife is what I think I initially would have thought.

BY MR. RAM:

Q    And why is that?

A    Him coming from the kitchen area it -- would assume it was a knife.  I just -- I guess that would be my guess if you had to make a guess.

Q    Okay.  Do you recall mom telling you there's no guns in the home?

A    I don't recall her saying that specifically.  It's possible.

Q    So the first time that you saw a weapon, was it after Darius Holcomb was in the bedroom with



Page 74

the door closed?

A     Yes.

Q     And you said that the weapon -- what was it?

A     It's like a -- the -- I mean, I'm sure you know what it is, but it's the fork, looks like a fork.

Q     A barbecue fork?

A     Yes.

Q     And how can you come to see the barbecue fork?

A     It was during the time he was saying he was gonna kill us, threaten, or whatever he was doing, he was throwing -- he was like going under the door.  I remember him trying to show it to us, I guess taunting or whatever he was doing, that's the first time I saw it.

Q     Was Mr. Holcomb talking when he was inside the bedroom, as far as you remember?

A     Yes.  I think he was talking.

Q     Was he talking to himself or talking to enforcement officers?

A     I don't recall.  He, for sure, was telling us he was gonna kill us a few times.  I don't specifically remember any specifics on what



Page 75

he was saying, but he was, like, yelling at us the majority of the time.

Q     All right.  Do you recall him having a conversation with somebody else?

A     I don't recall.  It's possible.

Q     Did you have any -- did you have any conversations with Deputy Bennett before he went inside the home?

A     I don't believe I talked to Bennett.  It's possible he would have called, or tried calling, but I may have could have not answered because I was having to hold the door, the bedroom door.  I don't believe so.

Q     When you say you had to hold the bedroom door --

A     Like, I had to provide lethal coverage on the front -- on the door, side of the door.  Once he shut the door and barricaded, I was sitting in the living room, standing in the living room for a long time.

Q     Okay.  Just walk me through just how other deputies came to respond to the scene, starting from, it was you who showed up with -- was it Deputy Clontz?

A     Clontz, Deputy Clontz, and Branson.



Page 76

Q    And Branson.  The three of you were there.

A    Yes.

Q    Okay.  And then you went inside the home; is that right?

A    (Witness nodding.)

Q    You're nodding.  Just yes or no.

A    Yes.  I'm sorry.  Yes.

Q    Okay.  And then that's when Mr. Holcomb went inside his bedroom was --

A    When I was standing, like, in the living room area, yes.

Q    Right.  Okay.  And so did you call for additional people to help at that point in time?

A    Once he barricaded, I believe I did.  I don't remember exactly who I called.  It would have probably been Zach or Bennett.  It probably would have been Zach, but I don't remember.

Q    Did you call on the radio?

A    Radio, yes.  I believe.

Q    Okay.  And what was -- what was the purpose of calling him on the radio?

A    Because at this point we had a barricaded subject, so that's when you'd want to call for backup.


MAGNA
LEGAL SERVICES

Page 77

Q    Okay.  And so was it Sergeant Featherston who you called; is that right?

A    I believe so.  I don't recall, but I do believe it would have been him.

Q    Okay.  And he was your direct supervisor?

A    Yes.

Q    Was he your supervisor on the SWAT Team or one --

A    He was assistant team leader, so yes.

Q    He was assistant team leader for SWAT?

A    Yes.

Q    Was he also your supervisor for --

A    He was my sergeant in warrants.  Yes, sir.

MR. FLIPPIN:  Let him ask his question.

THE WITNESS:  Sorry.  Sorry about that.

BY MR. RAM:

Q    So you called him and requested backup?

A    I believe so.

Q    Okay.  And just how do you go about doing that?  What's the procedure for you to do that?

A    I don't remember exactly what I said, but I said something along the lines -- I probably said something along the lines of, hey, we got one that barricaded, and then they would assume, like, just



Page 78

start heading that way.

Q    Did you make any other calls --

A    The only --

Q    -- for assistance --

A    -- thing --

Q    -- after that first one?

A    Sorry.  Sorry I keep -- I'm sorry about that.

So the only thing I do remember when Lieutenant Hawkins came on the radio, he had just said something along the lines of, what you got; and if I remember correctly I said -- or what's the charges -- I said sex offender registry violation, resisting arrest, and then I told him at that time I had -- I would have had threatening the life of public official, and I would have had resisting arrest also.  If it would have not turned out that way, I would have got those warrants.  So I had those active charges and then his charges.  I remember saying that -- I believe it was Hawkins on the radio -- and then I don't remember anything else after that on the radio traffic.

Q    Who was in charge of the scene prior to the shooting of Darius Holcomb?

A    When the shooting took place with the --



Page 144

Q    Or that was a rendezvous point.  So who met there?  Who was there?

A    Me, Clontz, and Branson.

Q    Okay.  And what was the purpose of meeting there at the skate park?

A    We were trying to wait on Bradshaw and Davis, but I believe they got called on another call so we ended up just going us three, since we had three.  Typically, you want two or three, if you can.

Q    Why were you gonna wait for Davis and Bradshaw?

A    Because they were the ones that asked for help, and I figured they'd want to be a part of the warrant service.

Q    Okay.  Did you need their help?

A    I didn't know at the time.

Q    What's that?

A    I didn't know at the time.

Q    You didn't know what?

A    I didn't know if I would need their help at the time, but you can't have too many.  It helps to have more on a warrant service.

Q    All right.  Let's set that aside.  All right.  If you can go back and pick up Exhibit


MAGNA
LEGAL SERVICES

Page 153

Q    Certified police officer?

A    Yes.

Q    Back at the time that you and others were dealing with Mr. Holcomb, back in January and February of 2023, you said there were some outstanding warrants that were trying to be served on him.

A    Yes.

Q    And on February 2, of 2023, that's when you went out and this incident happened; is that right?

A    Yes.  I believe so.

Q    What were those warrants for?

A    I believe it was a sex offender registry violation and I believe two resisting arrest warrants.

Q    Two resisting warrants?

A    I believe it was two.

Q    Are those valid arrest warrants?

A    Yes.

Q    As a law enforcement officer, are you charged with the duty to execute those warrants --

A    Yes.

Q    -- to serve them?

A    Yes, sir.



Page 154

Q    But what if a person has a mental issue or they have a drug issue, those warrants still need to be served?

A    Yes.

Q    Now, in terms of Mr. Holcomb, you said that you got some information from others about prior attempts to deal with him.

A    Yes.

Q    Now, to the extent he had any, quote, mental issues, do you know of any details about anything like that?

A    No details, no.

Q    Are you aware of any diagnoses that he had had with reference to any mental issues?

A    I'm not aware of any official diagnoses, no.

Q    You were aware of some of his conduct or actions, such as behavior; is that right?

A    Yes.

Q    And did I understand that there had been prior dealings with Mr. Holcomb?

A    Yes, sir.

Q    And he had been violent before.

A    Yes.

Q    Or resisted before.



Page 155

A    Yes.

Q    Now, on February -- or January 2023 and February 2023, this was not Mr. Holcomb's house, was it?

A    I believe it was his mother's house.

Q    Did you have any information, knowledge, or was it ever reported to you that he wasn't even supposed to be there?

A    No.  I believe his mom allowed him there.

Q    Did you have any information on knowledge that she had ever maybe told somebody that he wasn't supposed to be there?

A    Not that I can remember.

Q    Could that be the case and you not know about it?

A    Possible.

Q    And you haven't looked at every bit of body cam in this case, have you?

A    No.  No, sir.

Q    So it's possible that others had been told he's not even supposed to be here.

MR. RAM:  Objection.

THE WITNESS:  Very possible.

BY MR. HARTER:

Q    And you may not have known that.



Page 156

A    Very possible.

Q    All right.  Was -- when you dealt with -- attempted to deal with him on February 2, 2023, did his mother, or anybody, suggest to you that you shouldn't try to serve those warrants at that time --

A    No, sir.

Q    -- when you got there?

A    No, sir.

Q    When you got there, you said you and who else was with you?

A    Me, Stephen Clontz, and Branson, Brady Branson.  All warrant deputies.

Q    Okay.  All right.  And did you say that, at some point in time, he made a threat toward you?

A    Yes.

Q    Tell me more about that.

A    The threat was made to me as -- when I first saw him and as I heard he was saying something along the lines of, I'm gonna kill you -- I don't remember exactly how he said it -- as he walked towards me and then went into the room; and that's when the mom was saying, I don't know what's in his hands.  Those are the only two things I remember hearing in that instance.



MAGNA
LEGAL SERVICES

Page 157

Q    Let me understand a little bit more about that. You said, she said she didn't know what was in his hands. What was your thought at that point?

A    That he had a weapon. It felt unusual. You remember certain things in those heat of the moment situations, and I remember her just saying that, that made me direct my attention to his waistband area.

Q    The fact that you may not have made eye contact with him, did you have concern that he had a weapon --

A    Yes.

Q    -- or something at that time?

A    Yes.

Q    Was his hand -- could you see his right hand to see whether he did or did not have a weapon?

A    No.

Q    But his mother told you, I don't know what's in his hand.

A    Yes. Appeared he was holding something. I didn't directly see it, but appeared by his body positioning he was holding something in his right hand.

Q    And then I think what I understand was he



Page 158

ran into the bedroom; is that right?

A    Yes.

Q    Okay.  How long were y'all there trying to talk to him?

A    I couldn't give you an exact number, but it seem like multiple hours, it felt like.

Q    Were people trying to negotiate with him to get him to come out to talk to him?

A    I believe so.  Yes.

Q    Did -- at some point in time, did you tell us that you saw this edge weapon that he had?

A    I believe I mentioned -- I believe I mentioned at some point they didn't hear her say also that mom said what she said I believe; and then we all saw it when he was showing it to us under the door.  That's when we were all seeing it, or whoever was standing there most likely saw it.

Q    So he showed it to you under the door, and then I think you were asked about some of the statements he made and what he was saying.

Did he in any way threatened you, or law enforcement, or any officers at the scene, while he's in the room?

A    Yes.  Several times he mentioned about killing us, and stuff like that.  I can't tell you


MAGNA
LEGAL SERVICES

Page 159

exactly his words, unless I heard it, but he was making threats towards officers during that time.

Q    Okay.  Okay.  And let me make sure I understand.  Let's look at Exhibit 2, if you don't mind.

Officer Coats, I think that's -- I think that's your statement; is that right?

A    Yes, sir.

Q    Okay.  And this is a statement you made or wrote up and gave to SLED, real soon after this happened; is that right?  It's dated February 8, 2023.

A    Yes.  They used my supplemental as my statement.  Yes.

Q    Okay. All right.  And it's got your -- you got a date on there and you initialed it or signed it, right?

A    Yes.

Q    Okay.  Now, at some point -- about five or six paragraphs down, it talks about, I then was directed to breach the bedroom door; is that right?

A    Yes.

Q    And who gave you that direction?

A    Lieutenant Hawkins, if I remember correctly.



Page 160

Q    And he was the commanding officer on the scene in charge of the --

A    Yes, sir.

Q    Okay.  And you did what -- you did what you described in the statement:  You attempted to breach the door; is that right?

A    Yes.

Q    Okay.  And I think if -- as we looked at the video of the body-worn camera, we see that you're using a tool to breach the door, and you have to bang on the door several times, and then you're able to grab the door and move it out of the way; is that right?

A    Yes.

Q    Okay.  Now Officer Coats, let me make sure I understand.  You're wearing a body-worn camera at that time.

A    Yes.

Q    Okay.  Look up.  Tell me where your body-worn camera is mounted or strapped to your body.

A    It would have been somewhere on my vest.

Q    Somewhere on your vest.

A    Yeah.  Yes, sir.

Q    Now how -- that's not at eye level,



Page 161

though, is it?

A     No.

Q     And your body-worn camera is strapped to your vest, to your chest, and it is going to only look in the direction the camera is directed; am I right?

A     Yes.

Q     You mentioned a little while ago a thing called auditory exclusion.  Tell me about that.

A     From what I know about it, when you're in high-stress situations, you only like, hear, see, smell certain things that a lot of times that may be super relevant at the time, as in the mom saying that, you remember that.

An example, like, I don't remember the dog barking at me, almost biting me -- like on the video, it almost bites me at first, I don't remember that at all.

So like your brain does -- if I remember correctly, you hear things that are relevant in the heat of the situation.

Q     So you may retain something that -- I mean, something may have been said but you didn't retain it.

A     Oh, yeah.



Page 162

Q    Because you're focused on something else; am I right?

A    Hundred percent.  Hundred percent.  Yes, sir.

Q    Okay.  And Officer Coats, is it true, then, that with body-worn camera, that you often will see things that are not captured on the body-worn camera?

A    Yes.  It's possible.

Q    Now, let me ask this question.  When you breached the door, okay, and you were shown some clips of the -- of when you did that -- did you have an opportunity to observe Darius Holcomb where he was in that room?

A    I think I believe, as I was breaching it, there was a glimpse of his arm, maybe his head, like behind where the dresser was, or whatever was blocking the door.

Q    Okay.  And then did you ever see the rest of his body?

A    No.

Q    Well, when did you see the weapon, or the object in his hand?

A    I believe that was right as -- when I took the door off and as I was coming back around


MAGNA
LEGAL SERVICES

Page 163

is when I saw him standing there.

Q     Well, that's what I want to talk about.
When you saw his body with -- did he have that
weapon in his hand?

A     Yes.  According to my memory.

Q     And let me ask this question.  When you
were breaching the door, he's in the bedroom; am I
right?

A     Yes.

Q     Was he looking in the direction of the
door when y'all are banging on it?  Does that make
sense?

A     I couldn't -- with my memory he
definitely wasn't looking away, but his front of
his body -- his front of his head, forehead, was
kind of -- he was either looking somewhere where --
he wasn't looking the other way, but I don't know
exactly where he was looking.  Does that make
sense?

Q     Fair enough.  Fair enough.  But when you
glimpsed his body with that weapon in his hand, was
he facing you?

A     Yes.  At the time, my recollection he was
facing me.  Yeah.

Q     Okay.  And you described a little bit



Page 164

more what you thought, or how you perceived him to be moving forward or looking or kind of aggressive to you.  Explain that a little bit more for me.

A     In my memory it appeared he had an aggressive stance and was in the process of coming towards us.

Q     That's what you said.  You did say an aggressive stance.  Is that locked in your brain?

A     That image is -- again, I don't remember. I remember the -- I remember that, and then the dog.  I knew -- I kind of knew the dog was in there but I was so fixated on him and then how shiny the prone object was.  It looked like it was glowing. That's all I remember.  As far as I remember that's when I remember seeing his whole body.

Q     Okay.  And is that where we are when you -- in the statement that you wrote you said, "I then pulled the whole door all the way off and set it to the side.  I then observed Mr. Holcomb in the middle of the room holding a two-prong type weapon."  Is that right?

A     Yes.

Q     Okay.  And so am I right, Officer Coats, that Mr. Darius Holcomb was in the middle of the room at that point?



Page 165

A    Yes.  And this is what kind of started my frustration because I do remember him being in the center of the room, and if you watch the video the SLED guys are laughing and smiling and stuff and acting like I'm lying about him being in the center of the room, when that's what I perceived when -- if you look at where I'm at, that was perceived in the heat of the moment in the center of the room and that's where my frustration started with them.

Q    And let me make sure I understand. That's something you observed, yourself.

A    Yes.

Q    And whether that's picked up on body cam or not, that's what you saw with your eyes focused in the direction they were focused.

A    Yes.

Q    Now, Officer Coats, let me ask you, that distance between you as you breach the door or knock the door down, and Holcomb, how many feet is that?

MR. RAM:  Objection.

THE WITNESS:  I would assume less than three feet while I was at the door -- just the distance -- because he was on the other side of the dresser, so however long that dresser


MAGNA
LEGAL SERVICES

Page 186

Q    Okay.  And did you interact -- prior to this incident, had you ever had any interactions with any officers from the City of Spartanburg about helping them, or coming into the city to serve warrants on people?

A    Generally, yes.  A lot.

Q    Okay.  So you had a lot of interaction prior to this with Spartanburg City Police Officers about serving warrants, correct?

A    I couldn't tell you a number -- probably hundreds of times.

Q    Okay.  And probably other cities and towns within Spartanburg County, too, I would assume.

A    Pretty much all of them.

Q    Okay.  So this wasn't an unusual event for the Spartanburg County officers to contact you, and say, we're having trouble getting this person served, can you help us?

A    Probably daily I got that -- weekly at least I was asked to help.

Q    So this -- when Dylan Davis, and/or, Logan Bradshaw contacted you, it wasn't anything unusual, right?

A    No.



Page 187

Q    Okay.  Did you speak to anybody else about serving these warrants on Darius Holcomb other than Dylan Davis and anybody with the city -- other than Dylan Davis or Logan Bradshaw?

A    I don't believe so.

Q    Okay.  Those were the only two city police officers you communicated with, right?

A    I believe so.

Q    Okay.  Did Dylan Davis or Logan Bradshaw have any sort of authority over you at that time?

A    No.

Q    Okay.  They didn't have any supervisory authority over you, right?

A    No, ma'am.

Q    They didn't have any authority to make you come into the city in order to serve arrest warrants, right?

A    Right.

Q    Okay.  Could you have refused to help them serve these warrants on Darius Holcomb in this situation.  Could you have said, no, I'm sorry, I'm busy, I'm not working that day, or I just don't want to do that -- could you have said any of those things?

A    I could have but I typically wouldn't



Page 188

want to because I was always trying to help officers.

Q    Understood.  And before you went to serve the warrants, you said you actually checked in the Spillman system to confirm that there were warrants, right?

A    I believe I did.

Q    So you didn't just take Bradshaw or Dylan Davis's word for it, right?

A    No.  I don't believe so.  I believe I looked.

Q    And you went there to the house that day with the intent to serve what you believe were valid warrants on Mr. Holcomb, right?

A    Yes.

Q    You did not go there with any intent to harm him in any way, correct?

A    Absolutely not.

Q    Did you have any reason to think that Officer Bradshaw or Officer Davis wanted Darius to be harmed in any way?

MR. RAM:  Objection.

THE WITNESS:  No.

BY MS. COFFEE:

Q    Was it your understanding that Bradshaw



MAGNA
LEGAL SERVICES

Page 211

owns this cell phone, whether they deleted any text messages before these screen shots were taken?

A    Yes.

Q    Do you know?

A    It was during my second interview, it was a message that I had that I believe Bradshaw didn't have, which just to me proved even more to them that I didn't delete anything.  Something -- probably talking smack about his supervisors I think.  I can't remember exactly what it was because I remember the younger SLED guy said, Oh, we don't have that message, and I was like, Well, I do you, can have it, but I don't remember the exact message though.

Q    So the SLED investigators gave you the impression that you had saved messages that others had perhaps not saved.

A    Correct.

Q    When you arrived on scene on February 3, 2023 did you recognize Darius's mom?

A    Yes.

Q    Okay.  Because you had interacted with her before.

A    Yes.

Q    Do you know if she recognized you?



Page 212

A     Yes.  I believe she did.

Q     Did she ask you to call 911 -- sorry. Did she ask you to call for paramedics to come get Darius?

A     No.

Q     Did she ask for you to call mental health?

A     No.

Q     Did she appear to have -- surprised by the fact that y'all are there to arrest him?

A     No.  It seemed like it was, y'all are here again kind of --

Q     She let you in the door.

A     Yes.

Q     She didn't try to stop you in any way.

A     No.

Q     On that occasion did mom tell you about that Darius had -- Holcomb had schizophrenia?

A     No.

Q     Okay.  Did she ever tell you that?

A     Not that I can recall.

Q     We were discussing the actual sequence of events surrounding the breach and ultimately the shooting of Mr. Holcomb.  I think you testified that at no point did you -- back up.  You were

