*TERRIA HOLCOMB, PERSONAL REPRESENTATIVE FOR THE ESTATE OF DARIUS L. J. HOLCOMB v. SPARTANBURG COUNTY, SPARTANBURG COUNTY SHERIFF'S OFFICE, OFFICER WESLEY E. BENNETT, SHERIFF BILL RHYNE, CITY OF SPARTANBURG, DYLAN DAVIS, AND SEAN JACOB COATS*

**C/A No. 7:24-cv-1145-JDA-KFM**

# Exhibit G

To Defendant Sean Jacob Coats' Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION
C.A. NO.: 7:24-CV-01145-JDA-KFM


TERRIA HOLCOMB, AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF DARIUS L.J. HOLCOMB,

                    PLAINTIFF,

VS.


SPARTANBURG COUNTY, SPARTANBURG COUNTY
SHERIFF'S OFFICE, OFFICER WESLEY E. BENNETT
BOTH INDIVIDUALLY AND IN HIS CAPACITY AS A
DEPUTY OF THE SPARTANBURG COUNTY SHERIFF'S
OFFICE, SHERIFF BILL RHYNE IN HIS OFFICIAL
CAPACITY; CITY OF SPARTANBURG, DYLAN DAVIS,
AND SETH JACOB COATS,

                    DEFENDANTS.



                    D E P O S I T I O N


WITNESS:        SETH STOUGHTON
DATE:           APRIL 15, 2026
TIME:           2:04 P.M.
LOCATION:       CLAWSON & STAUBES
                1612 MARION STREET, SUITE 200
                COLUMBIA, SOUTH CAROLINA 29201

REPORTED BY:    AMBER SOMERO







                    LEGAL EAGLE
              POST OFFICE BOX 5682
          GREENVILLE, SOUTH CAROLINA 29606
                  864-467-1373
            DEPOS@LEGALEAGLEINC.COM

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Stoughton, Seth 04/15/2026                                                        2

APPEARANCES:

        COLIN W. RAM, ESQUIRE
        COLIN RAM LAW FIRM
        941 HOUSTON NORTHCUTT BOULEVARD, SUITE 203
        MOUNT PLEASANT, SOUTH CAROLINA 29464
        colin@sctrial.com
                    REPRESENTING THE PLAINTIFF


        RUSSELL W. HARTER, JR., ESQUIRE
        CHAPMAN HARTER, PA
        14 LAVINIA AVENUE
        GREENVILLE, SOUTH CAROLINA 29601
        rwhjr@chhlaw.net
                    REPRESENTING THE DEFENDANT WESLEY BENNETT


        CHARLES F. TURNER, JR., ESQUIRE
        WILLSON JONES CARTER & BAXLEY, PA
        325 ROCKY SLOPE ROAD
        GREENVILLE, SOUTH CAROLINA 29607
        cfturner@wjlaw.net
                    REPRESENTING THE DEFENDANT


        TODD R. FLIPPIN, ESQUIRE
        HOLCOMBE BOMAR, PA
        101 WEST ST. JOHN STREET, SUITE 200
        SPARTANBURG, SOUTH CAROLINA 29306
        tflippin@holcombebomar.com
                    REPRESENTING THE DEFENDANT SEAN JACOB COATS


        MICHAEL E. HIRSCH, ESQUIRE
        CLAWSON & STAUBES, LLC
        7400 CARMEL EXECUTIVE DRIVE, SUITE 300
        CHARLOTTE, NORTH CAROLINA 28226
        mhirsch@cslaw.com
                    REPRESENTING THE DEFENDANT DYLAN DAVIS


        JAMES E. HAARSGAARD, ESQUIRE
        RICHARDSON PLOWDEN & ROBINSON, PA
        235 MAGRATH DARBY BOULEVARD, SUITE 100
        MOUNT PLEASANT, SOUTH CAROLINA 29464
        jhaarsgaard@richardsonplowden.com
                    REPRESENTING THE DEFENDANT CITY OF SPARTANBURG

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Stoughton, Seth 04/15/2026                                                    3

```
                            INDEX
STIPULATIONS, WAIVER AND OATH ......................    4

EXAMINATION BY MR. HARTER ..........................    4

EXAMINATION BY MR. TURNER .......................... 152

EXAMINATION BY MR. FLIPPIN ......................... 217

EXAMINATION BY MR. HIRSCH .......................... 267

EXAMINATION BY MR. HAARSGAARD ...................... 275

ERRATA SHEET ....................................... 282

CERTIFICATE OF REPORTER ............................ 283



                           EXHIBITS



DEFENDANT'S

NO. 1 CV ...........................................    9

NO. 2 102-PAGE REPORT .............................. 11

NO. 3 EXPERT REPORT BY CHRISTOPHER WATSON............ 12
```

(THIS TRANSCRIPT MAY CONTAIN QUOTED MATERIAL.  SUCH MATERIAL

IS REPRODUCED AS READ OR QUOTED BY THE SPEAKER.)

A.  Yeah, there were definitely discussion of, if you don't come out, this will escalate.

Q.  All right.  And -- and -- and -- and -- and what else did they do to try to get him to come out, other than talk to him?

A.  So after the talking, they introduced a chemical munition.

Q.  Okay.

A.  They introduced several other chemical munitions.  They ultimately breached the door and sent a dog in.

Q.  Okay.  Now, but they -- they negotiated with him for, what, two hours; is that right?

A.  Yeah, about that.

Q.  Okay.  Did he make any threats to them, to law enforcement?

A.  Yes.  He made a whole series of statements, some of which were threatening to hurt or execute officers, other of which were much less sensical.

Q.  Okay.  And I think the body-worn camera showed at some point he showed them a weapon under the door; is that right?

A.  Yeah, it appears to be the same like two-pronged barbecue fork thing.  They sort of shoved the metal ends of it underneath the door.

Q.  How long was the barbecue fork?

A.   I mean, when it came under the door, it was only an inch or two that came out under the door, but the whole thing was like a standard barbecue fork.  I -- I don't know exactly how long.

Q.   About a foot?

A.   Yeah, maybe 12 inches or so.

Q.   Okay.  Well, did -- did he -- did he -- did he show that and just let them know he had a weapon?

A.   I would not want to be in the position of even speculating why he was doing anything, given his mental state at the time.

Q.   Well, if you were an officer and you saw it, would you feel like this person is showing me a weapon because they're sticking this under the door and they're not coming out and they're making threatening comments?

A.   Sure.  I think an officer could definitely say that large fork object looks like a weapon, yes.

Q.   I mean, is it similar to a knife, that fork?

A.   I mean, I'd say it's similar to a fork, right?  It's not a knife in the sense of having an edge.  It's a -- it's similar to a fork in the sense of having a point.

Q.   It's got a sharp point to it, right?

A.   Two, in fact.

Q.   Okay.  And -- and that's the type of weapon that can even penetrate through a Kevlar vest, isn't it?

A.  I mean, it would be tough with modern Kevlar, but it could -- I mean, maybe.

Q.  I mean, it -- it would be a weapon, in your view, as a law enforcement officer, if you have a suspect who is resisting arrest and making threats?

A.  Oh, yeah.

Q.  Am I right?

A.  Yeah, absolutely.

Q.  It would be a deadly weapon, wouldn't it?

A.  Depending on how it's employed, but yeah, absolutely. That could certainly be used.

Q.  It would -- it would -- you would be -- an officer would be reasonable in believing that this person has what would be a deadly weapon; am I right about that?

A.  Sure.  I would describe that as, an officer applying generally-accepted practices could certainly conclude that someone with this type of fork has the ability to inflict serious bodily injury or death.

Q.  Okay.

A.  In that way, it is a weapon, yes.

Q.  Okay.  All right.  So let me comment.  You mentioned and you referred to in your report a generally accepted police practices.

A.  Yes.

Q.  And that's pretty much your area of expertise; am I

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Stoughton, Seth 04/15/2026                                                          176

Q.    Okay.  All right.  And they tried for -- I'm going to quibble with you a little bit about the two hours.  I think it's more like two and a half, but ---

A.    I think that's right.

Q.    Several hours, let's just say.

A.    Yeah.

Q.    They didn't go rushing in with guns blazing.  They sat there for a decent amount of time.  I know you want to see more, but they did try to talk him out of it.  In fact, looking at the videos, those officers were begging him to come out with them.  And not in a threatening way, in a friendly way, please don't do this.  Please come out.

A.    Yeah.

Q.    Please cooperate with us.

A.    There -- there -- there was over that, and I'm fine with two and a half hours, right, from about 3:00 until 5:40-ish, 5:36, something like that.  Yeah, there were a whole range of communications, right?  Some of that was -- was very low key.  Some of it was much more like, look, if you don't, this is what's going to happen.  There was a whole range of options.

Q.    And -- and then they tried the chemical munitions.  And that's a level of force now.  Now, we're getting into -- -

A.   I apologize for the complicated nature of this.  I'm going to answer that question in two parts.  The first one is the easy one, and I think it's the one you -- you care about, which is, I have no particular opinion or no specific opinion as to -- as to that text message.  And as I've generally talked about, I don't get into like causality.

The other part, and the slightly more complicated one, is I don't attempt to connect any of my opinions to legal theories.  That is Mr. Ram's job, not -- not my job.  So does that answer your question?

Q.   I think it does, but in some instances, it does not inform the threat assessment analysis performed by Mr. Coats on February 2nd; is that fair?

A.   Yes.  I think that's fair.

Q.   Are you willing to add any role in -- in the decision to execute warrants on February 2, 2023?

A.   I wouldn't want to give you a good answer because anything I would do would be sort of subjective speculation or speculation about their subjective mind set.  I do think as a -- as a general matter, it's not -- it's not appropriate to read firm meaning into conversations, especially just conversations between officers.

Officers are going to say some stuff, and in

communicating with each other, they may say stuff in problematic or unprofessional ways.  I don't -- I don't read a lot of -- I don't read into that.  I look much more at the -- at the decisions rather than trying, myself, to connect particular language or -- or phrasing to a particular decision.

Q.  Okay.  You mentioned the fact that you were aware that the Spartanburg Police Department had recruited from, or declined to execute warrants in, some occasions prior to February 2nd.  Does the fact that that department declined to serve the warrants -- does that affect the regional or Sean Coats' decision to execute warrants on February 2nd?

A.  No, not necessarily.  At least in this -- in the abstract, just because one agency chooses to do something or not do something does not mean that it would be unreasonable for another agency to make that choice.  So it's not because of this other agency's decision that is sort of most relevant.  It -- it's relevant to my analysis only to the extent that like there was a tactical option here that was reasonable. There was a tactical option here that was unreasonable. The city did one.  The county did the other.  But it's not, because of, if that makes sense.

Q.  Do you understand that Sean Coats was assigned to the

A.    No.

Q.    The method of engagement with Darius Holcomb was appropriate and reasonable in your opinion?

A.    That was not the focus of most of what I reviewed.  I'm sure I could find things.  I mean, I remember I could certainly find things that I liked about the communication.  I can certainly find things like some of the more explicit statements about forcing entry that are not great, but that really wasn't the focus of my -- of my review.

Q.    It wasn't about forced entry.  It was about negotiation ---

A.    Right.

Q.    --- for that two-hour plus time period.

A.    No.  I ---

Q.    You don't have an opinion as to it being unreasonable, correct?

A.    Yes, that's right.  And I wasn't referring to the forced entry.  I was talking about like the statements or threats or whatever you want to call them about forcing entry.

Q.    Okay.  I mean, just the fact that they had over two hours in that time period, is that evidence to you of a rush to action or is that a sign of taking tactical pause in one of the situations you develop and, you

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Stoughton, Seth 04/15/2026                                                    256

know, improve the possible outcomes?

A.   Oh, no, that was good.  The latter, right?  They're -- they're taking time.  They're communicating.  They are maintaining scene stability there.  I have no issues with that.

Q.   And do you remember listening to that interaction?  Do you remember instances where they were offering to help Darius?

A.   Yes.

Q.   Okay.  And that -- that's all the part of the generally-accepted police procedures as far as dealing with someone's mental health, correct?  And that's what you agree about, right?

A.   Sure.

Q.   Okay.  And they gathered information from family and then they were talking to mother.

Are you aware that the sister was also on scene?

A.   Yes.  I don't -- I don't remember the time frame exactly, but yes.

Q.   The family members were engaged with the -- with the sheriff's office on scene, correct?

A.   Yes.

Q.   Okay.  Do you have an instance of where they were misrepresenting something at all during this two-hour period?

A.    The ---

Q.    The family and officers.

A.    Nothing that I can recall offhand, no.

Q.    Okay.  They weren't lying to him and telling him he's going to Disneyland or something, right?

A.    No, not -- no, not that I remember.

Q.    I mean, that's my view on it is they were just telling factual things, hey, we're here to help you, but we've got to get you out of here, those sorts of things.  But nothing with an intent to deceive him or something like that, correct?

A.    Yeah, I just want to caveat my statement by saying I'm not going to diagnose an officer's intent for doing something, but yes, I agree with you.

Q.    Okay.  That's a fair statement.  But nothing would be apparent intentional deception; how about that?

A.    Sure.

Q.    How about this, during that two-hour period -- we've already talked about this -- Holcomb was in there saying some crazy stuff, right?

A.    Yeah.  I think that's a fair description.

Q.    I think, you know, maybe some folks would take offense at that way of describing it, but I think for generally-accepted police practices saying things like -- that is widely acceptable and normally done in terms of using

the word crazy.

A.   It does not -- it does not offend me.

Q.   I'm sorry, go ahead.

A.   I was saying it does not offend me.

Q.   Got you.  During that two hours of negotiations, would anyone who could hear Holcomb in that time period have any reason to believe that he was not mentally ill?

        MR. RAM:  Object to form.

BY MR. FLIPPIN:

A.   I think it may depend on exactly what part of his statement they're -- they're listening to, but if you're around for -- I mean, if you're around for all of it, no, I think -- I think with his statements, both what he's saying and the way he's saying it, are pretty strong indications of mental illness.

Q.   Would you think that probably applies to the vast majority of that time period in terms of the things he said out loud?  The vast majority of those statements were indicative of either incoherent or indicative of a breach of grounds; is that fair?

A.   Sure.  Yeah, I think that's fair.

Q.   So if anyone is on scene or they're outside of the room, they're going to know -- it's reasonable that they would understand that Holcomb had some sort of mental health problem, correct?

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Stoughton, Seth 04/15/2026                                                    259

A.    I think that would be a fair conclusion.  Again, just to emphasize what I said earlier, we don't want officers assuming that other officers are aware of things.  So I would still want officers to communicate, especially as new officers arrive on scene, right?  Like this guy's 1096 or whatever, right, whatever the best way to communicate that is.

But yeah, I think it's fair to say that anyone who is exposed to big chunks of this encounter should probably be coming to the professional conclusion that this guy is not altogether sane.

Q.    And the -- well, let me ask it this way.  For that threat assessment, the officer who testified being part of the generally-accepted practices, going back to the apparent intention part, part three of that assessment, how does someone who's significantly mentally impaired, like yourself, if you're schizophrenic, how does that fact inform that stage of the analysis, the apparent potential analysis?

A.    You still have to look at their behaviors, right?  You look at their behaviors and you say, what does it look like they're trying to do?  In that way -- and I just want to be clear, you're not looking at motivation, right?  Officers are not -- are not supposed to figure out motivation in terms of why does he want to do this