***TERRIA HOLCOMB, PERSONAL REPRESENTATIVE FOR THE ESTATE OF DARIUS L. J. HOLCOMB v. SPARTANBURG COUNTY, SPARTANBURG COUNTY SHERIFF'S OFFICE, OFFICER WESLEY E. BENNETT, SHERIFF BILL RHYNE, CITY OF SPARTANBURG, DYLAN DAVIS, AND SEAN JACOB COATS***

**C/A No. 7:24-cv-1145-JDA-KFM**

# Exhibit H

To Defendant Sean Jacob Coats' Motion for Summary Judgment

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION
C.A. NO.:  7:24-cv-1145-JDA-KFM

TERRIA HOLCOMB,
AS PERSONAL REPRESENTATIVE
FOR THE ESTATE OF
DARIUS L.J. HOLCOMB,

PLAINTIFF,

vs.

SPARTANBURG COUNTY,
SPARTANBURG COUNTY SHERIFF'S OFFICE,
OFFICER WESLEY E. BENNETT,
SHERIFF CHUCK WRIGHT, CITY OF SPARTANBURG,
DYLAN DAVIS AND SEAN JACOB COATS,

DEFENDANTS.


D E P O S I T I O N


WITNESS:              WESLEY E. BENNETT
DATE:                 NOVEMBER 19, 2025
TIME:                 10:04 A.M.
LOCATION:             SPARTANBURG DOWNTOWN MEMORIAL AIRPORT
                      500 AMMONS ROAD
                      SPARTANBURG, SOUTH CAROLINA 29306
REPORTED BY:          FOTINI S GREGORY


LEGAL EAGLE
Post Office Box 5682
Greenville, South Carolina 29606
864-467-1373
depos@legaleagleinc.com

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Bennett, Wesley E. 11/19/2025                                                    2

```
 APPEARANCES:


      COLIN RAM, ESQUIRE
      COLIN RAM LAW, LLC
      941 HOUSTON NORTHCUTT BOULEVARD
      SUITE 203
      MOUNT PLEASANT, SOUTH CAROLINA 29464
      colin@sctrial.com

           ATTORNEY FOR THE PLAINTIFF,


      RUSSELL W. HARTER, JR., ESQUIRE
      CHAPMAN HARTER, P.A.
      PO BOX 10224
      GREENVILLE, SOUTH CAROLINA 20603
      rwhjr@chhlaw.net

           ATTORNEY FOR WESLEY BENNETT,


      VAL D'AMBROSI, ESQUIRE
      RICHARDSON PLOWDEN
      235 MAGRATH DARBY BOULEVARD
      MOUNT PLEASANT, SOUTH CAROLINA 29464
      vdambrosi@richardsonplowden.com

           ATTORNEY FOR THE CITY OF SPARTANBURG,


      CHARLES F. TURNER, JR., ESQUIRE
      WILLSON CARTER JONES & BAXLEY, LLC
      325 ROCKY SLOPE ROAD
      SUITE 201
      GREENVILLE, SOUTH CAROLINA 29607
      cfturner@wjcblaw.com

           ATTORNEY FOR SPARTANBURG COUNTY SHERIFF'S OFFICE,
```

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Bennett, Wesley E. 11/19/2025                                    3

```
APPEARANCES CONT'D:


      MADALYN A. DALTON, ESQUIRE
      CLAWSON & STAUBES, LLC
      200 EAST BROAD STREET
      GREENVILLE, SOUTH CAROLINA 29601
      mdalton@cslaw.com

           ATTORNEY FOR DYLAN DAVIS,


      TODD R. FLIPPIN, ESQUIRE
      HOLCOMBE BOMAR, PA
      101 WEST SAINT JOHN STREET
      SUITE 200
      SPARTANBURG, SOUTH CAROLINA 29306
      tflippin@holcombebomar.com

           ATTORNEY FOR SEAN JACOB COATS.




ALSO PRESENT:

RICHARD EDMOND - VIDEOGRAPHER
PATTY SANDERS
```

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Bennett, Wesley E. 11/19/2025                                                                4

```
                              INDEX


STIPULATIONS  ......................................   5

OATH  ..............................................   6

EXAMINATION BY MR. RAM  ............................   6

EXAMINATION BY MR. HARTER .......................... 167

EXAMINATION BY MS. DALTON .......................... 172

EXAMINATION BY MR. HARTER .......................... 173

EXAMINATION BY MR. RAM ............................. 173

ERRATA SHEET ....................................... 176

CERTIFICATE OF REPORTER ............................ 177



                            EXHIBITS

PLAINTIFF'S

No. 1 SLED ATTACHMENT #19 .......................... 116
```

(THIS TRANSCRIPT MAY CONTAIN QUOTED MATERIAL.  SUCH MATERIAL

IS REPRODUCED AS READ OR QUOTED BY THE SPEAKER.)

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Bennett, Wesley E. 11/19/2025                                    27

Henderson.  And he also met with the K-9 handlers, who was deputy Shehan and BJ Tillinghast.  They came up with a plan that, hey, this is what we think we can do.  And they were the ones that enacted that plan.

Q.  Okay.  How were you made aware of that plan?

A.  Lieutenant Hawkins came up and told us, like, after the -- after we had introduced, tried negotiations, tried to talk to him, introduced some gas munitions to try to get him to come out of the room.  Ultimately, he was refusing to come out.  I believe it was Lieutenant Hawkins came in and told us, "Hey. We're going to breach the door and we're going to send the K-9 in to try to locate him in the room."

Q.  And he told that to you and others?

A.  Generally, everybody that was in the living room.

Q.  Okay.

A.  I mean, he didn't specifically walk up to me and say, This is what we're going to do.  He was kind of telling everybody as a group.

Q.  And how far in advance of breaching the bedroom door did that discussion occur?  Was it just a few minutes before?  Was it an hour before?  30 minutes before?

A.  I don't know ultimately, how long the planning process took.  It could have been a few minutes.  I would say, probably a few minutes before he came in and said, "Hey.

Q.   Okay.  And when you say ported the windows, you're talking about breaking the windows, right?

A.   Well, making a hole in the window so we can get -- I mean, we have to get a hole in the window to introduce the gas.

Q.   And -- and how do you make a hole in a window that's glass?

A.   In that situation, they used what was referred to as a halogen tool to break in, to break the window and open it up so we can literally put a gas grenade in there.

Q.   Okay.  So to break the glass window and put a gas grenade inside the bedroom?

A.   A CS can, yes, sir.

Q.   Okay.  And that's -- do you think that's appropriate to do with an individual who's having a mental health crisis in their bedroom?

     MR. HARTER:  Object to the form.

     MR. TURNER:  Object to the form.

     MR. FLIPPIN:  Same objection.

BY RE. RAM:

A.   So that's our typical response to anybody that's barricaded in a bedroom.  Regardless, that's ultimately what -- what -- a tactic that's used to remove somebody from the bedroom.

Q.   Okay.  Do you know whether pain compliance is more

A. I think he kind of just shut down and quit talking to us all together. I don't think anything was being said.

Q. Okay. And so once K-9 Atlas was biting on Mr. Holcomb, and you stated that you observed Mr. Holcomb make several downward stabbing thrusts towards Atlas head. Why at that point, where Mr. Holcomb's attention is diverted to what's going on to him personally, was a taser not used?

MR. FLIPPIN: Object to form.

MR. HARTER: Object to form. Go ahead and answer.

BY MR. RAM:

A. So I'm the first one in the room, so I'm standing there armed with my -- with my sidearm. We've already attempted the less lethal options, multiple less lethal options, at this point. We tried negotiations. We tried CS gas. Ultimately, we introduced the dog. We tried to force a surrender. He told us his plan, had told us his threat. You know, that he was going to -- I think at one point, he even said, execute us. He was going to try to kill us. We were physically going to have to come in there and get him. Once the dog was entered the room, and we were already under ten feet from him, he began acting on those threats.

Q. And how did Mr. Holcomb start acting on those threats?

A. He began physically attacking the dog with making the

TERRIA HOLCOMB vs SPARTANBURG COUNTY, ET AL.
Bennett, Wesley E. 11/19/2025                                                          136

stabbing motions towards dog.

Q.   And did that justify, to you, that you could legally shoot him?

A.   Not the attacks toward the dog itself.  The fact that we were already under ten feet with a subject armed with a deadly weapon, an edged weapon, is why I acted in the way that I did.

Q.   Did Mr. Holcomb threaten you with the weapon that was in his hand?

          MR. FLIPPIN:  Objection.

BY MR. RAM:

A.   Specifically threatened me?

Q.   Yes, sir.

A.   So I'm standing within five feet, five to eight feet of him that I estimated.  That gap is already enough for him to close the distance incredibly fast.  So that's why we're reacting to what we have going on.

Q.   And before the door was breached, you're aware that he had been making threats to officers; is that correct?

A.   Correct.

Q.   And you were aware that he had some sort of weapon in there.  You didn't know what quite -- what quite what it was, but you're aware that there's a weapon in there, correct?

A.   Correct.

Q.  Okay.  And then you breached the door, and he had the weapon that you believe that he had in there, correct?

A.  He had a weapon, yes.

Q.  Did Mr. Holcomb advance towards you?

A.  Ultimately, as the situation transpired, he ended up right at the base of -- at my feet.  I mean, I would assume two feet at the most.

Q.  Was that after you shot him?

A.  That was during the process.  As it was happening, he was coming forward.

Q.  As you were shooting him?

A.  He ended up falling directly in front of me.

Q.  Okay.  Before you shot him, did Mr. Holcomb physically move towards you?

A.  He was already under the ten feet, so, I mean, he was five to eight feet when the shots began to fire.

Q.  What is it -- what is the ten feet threshold that you're referring to?

A.  So we're trained through the Criminal Justice Academy that a standard reactionary gap for an officer encountering an edge of weapon, is 30 feet.

Q.  And what does that mean?

A.  So somebody that has an edged weapon can close that distance faster than the officer has the ability to react to it.